**PHOTON, INC.**

v.

**HARRIS–INTERTYPE CORPORATION.**

**HARRIS–INTERTYPE CORPORATION**

v.

**PHOTON, INC.**

**Civ. A. Nos. 60–219, 60–412.**

United States District Court
D. Massachusetts.

Nov. 30, 1964.

See also D.C., 28 F.R.D. 327.

---

Civ. A. No. 60–219:

Melvin R. Jenney, Jeremiah Lynch, Boston, Mass., for plaintiff.

W. R. Hulbert, Fish, Richardson & Neave, Boston, Mass., Marechal, Biebel, French & Bugg, Dayton, Ohio, Lawrence B. Biebel, Dayton, Ohio, Dailey L. Bugg, Dayton, Ohio, W. R. Hulbert, Boston, Mass., of counsel, for defendant.

Civ. A. No. 60–412:

Marechal, Biebel, French & Bugg, Dayton, Ohio, Lawrence B. Biebel, Dayton, Ohio, Dailey L. Bugg, Dayton, Ohio, W. R. Hulbert, Boston, Mass., of counsel, for plaintiff.

Melvin R. Jenney, Kenway, Jenney, Hildreth, Boston, Mass., for defendant.

CAFFREY, District Judge.

Civil Action 60–412 is a suit for patent infringement commenced in the United States District Court for the Southern District of New York by Harris-Intertype Corporation (Harris) against Photon, Inc. The complaint is based on two patents issued to one Cecil L. Tansel, No. 2,725,803 issued December 6, 1955 (hereinafter referred to as Tansel '803)

and No. 2,896,523 issued July 28, 1959 (hereinafter referred to as Tansel '523).

After the commencement of the suit in New York, Photon filed in this court Civil Action 60–219 for a declaratory judgment against Harris. The second case involved substantially the same issues as those in litigation in the New York case, plus a claim for declaratory judgment with reference to Harrold and Pritchard patent No. 2,475,497, which claim was dismissed on motion by another Judge of this Court, leaving the two cases, for all practical purposes, with identical issues. The motion by Photon to transfer the New York case to this District for trial was allowed and the cases were consolidated for trial and tried together. The parties tried the consolidated cases on the theory that Harris was to be considered the plaintiff suing Photon for infringement·of the two above-named Tansel patents and that Photon was to be considered the defendant who had counterclaimed for a declaration of invalidity and non-infringement.

Harris is a Delaware corporation and is now the owner of the Tansel patents. Photon, successor to Lithomat, Inc., is a Massachusetts corporation with a usual place of business at Wilmington, Massachusetts.

At the time of trial, Harris had developed photocomposing machine prototypes which were then undergoing field testing at commercial printing establishments. No evidence has been offered of the sale of any Harris machine made under the Tansel patents. For some years Photon has manufactured and sold photocomposing machines. Its latest models are designated by it as Series 200 and Series 500. These machines are based on United States applications and patents filed or obtained by Rene Higonnet and Louis F. Moyroud.

Application SN 56,880, on the basis of which Tansel patent '523 was issued, became the subject of interference No. 84,685 in the United States Patent Office, together with Higonnet et al application SN 610,336. The interference culmi-

nated in an award by the Court of Customs and Patent Appeals of the invention to Tansel. (See Tansel v. Higonnet, et al, 215 F.2d 457, 42 CCPA 732.) Interference counts presented on behalf of Higonnet et al were intended to cover and afford patent protection for the Photon development. These claims were drafted and presented to the Patent Office on behalf of Higonnet by the attorney who now represents Photon in the instant cases. These claims now appear as Claims 8 and 9 in Tansel patent '523 by reason of the decision of the Court of Customs and Patent Appeals awarding those two claims to Tansel.

Extensive pretrial discovery took place in these cases and both parties filed several hundred pages of briefs both before and after the two-week trial. The case was orally argued by experienced patent counsel. In the course of the trial an early model of the Tansel machine was introduced into evidence and a motion picture of it in operation was shown. An early model of the Higonnet machine was also introduced in evidence. Various experiments were conducted by experts both in the courtroom and in a room at the Parker House in which display equipment had been assembled. Specimens of the work done by various machines were accepted in evidence and a view was taken of the latest Photon machine at the Photon factory in Wilmington, Massachusetts.

In addition, the parties offered in evidence a mass of documentary material including authenticated copies of all patents allegedly constituting prior art. At the outset of the trial counsel for Harris expressed the opinion that the prime issue in these consolidated cases is validity of the Tansel patents and counsel for Photon concurred in this opinion. Harris concedes that the decision of the Court of Customs and Patent Appeals in the interference which awarded Claims 8 and 9 of patent '523 to Tansel is not *res judicata* in this proceeding. Harris urges, however, that Photon must sustain a heavy burden herein to overcome the presumption of validity created

by the decision in favor of Tansel in the interference and from the fact that the patents were issued.

I find as follows:

The subject matter of the Tansel patents is an electrically operated machine for photocomposition. Photocomposition is the projection of characters from a matrix by optical means to a photosensitive film or paper. Conventional means are then employed to make from this film a printing plate whereby printing processes may be performed without the use of lead type in any stage of the printing procedure. Photocomposing machines eliminate the necessity for the use of brass matrices or molds from which type is cast. They also eliminate handling and circulating of such matrices in a typesetter and the casting of slugs in hot-type metals in such matrices and the assembling of slugs into a frame or chase, as well as making a proof therefrom and the photographing of it.

The Tansel patents describe the use of flash photography (also called in the trade strobe flash) for projecting the characters on to the film or paper while a character carrier in the form of a drum is rotating.

 The first issue that must be resolved is whether or not the Tansel patents are invalid for lack of invention, on the familiar principle that a combination which only unites old elements, with no change in their respective functions, and which fails to produce some new result or some novel use, does not contain invention and is, for that reason, not patentable. Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162 (1950). The elements included in the Tansel patents for a photocomposing machine are: a keyboard, a register, a system for justification, a variable width device, a rotating character carrier, and a flash illumination. Defendant contends that all of these elements are now and were old at the time of Tansel's alleged invention, and that the patents in suit call for nothing more

than a combination of these old elements with no change in their respective functions.

Harris contends that the Tansel concept does amount to invention, saying in its reply brief after trial, "Basically, our position is that the prior art either did not recognize the problem or offered no practical solution to it," citing S. D. Warren Co. v. Nashua Gummed & Coated Paper Co., 205 F.2d 602 (1 Cir. 1953), and Diamond Rubber Co. of New York v. Consolidated Rubber Tire Co., 220 U.S. 428, 31 S.Ct. 444, 55 L.Ed. 527. Harris argues in the same brief (p. 22):

"The concept of the combination and the means for accomplishing the improved result was what was novel, and the fact that a flash circuit was old in other arts is wholly immaterial."

Harris also urges in its reply brief (p. 31):

"The very object of Tansel's inventions is to provide an apparatus which will photograph the characters rapidly and accurately with absolute fidelity and high precision * * * the prior art does not teach the required precision * * * Tansel does teach how to attain his object with a definiteness and particularity required by the patent law and his patents deserve recognition of the same order. The principal issue in this case narrows down to just that. As this issue is developed in defendant's brief it involves an attack on the general degree of precision which Tansel achieved and more specifically whether Tansel's system embodies a rough and precise control."

In approaching the question of invention an understanding of the "conventional" method of commercial printing used by approximately 90 per cent of commercial printers of books, newspapers, magazines, etc., would seem to be in order. The most commonly used commercial equipment today and for a number of years past consists of the hot

metal type machine. These machines have a keyboard with a great many more keys than a typewriter, and separate keys for different characters both capital and lower case. They contain a magazine in which are kept a series of so-called mats or matrices. A mat is a character-bearing mold from which the final character is made. Each different character has a mat. The width of the mat determines the width of the character in the final assembly of the line. When a key is pressed on the keyboard the appropriate mat drops into a moving slide and then into an assembler, thus making up the sentence or line that is being composed. At the end of a word the operator drops a space band into the line being composed, through the use of a key, to separate the mats making up that word from those which will make up the next word. When the row of mats composing a complete line, together with the space bands between the words is transferred through the machine to the casting position, the space bands are moved upward so as to force the words apart until the line occupies a pre-set length, because all lines must be the same length (except for blank verse, some advertising copy and a few other special situations). The casting action then takes place automatically. A slug is then produced, representing the entire line. Then the line slug is discharged from the machine into the galley where it is lined up to form the columns that ultimately comprise a page.

The machine then picks up the group of mats and space bands and separates the space bands from the mats and drops the space bands back into the feed position. It then picks up the complete set of mats that are forming the words and transfers them back into the machine where they are automatically dropped back into the channels where they belong. Next, the group of slugs forming a column or page are picked up and packed and held together so they do not break up and are placed into a case or frame which holds them in position for the printing form. There may or may not be a number of pages in the form. This form becomes either the original printing source, i. e., it may be inked and printed directly on paper on a press, or it may become the master from which duplicate printing plates are made up thereafter for various forms of printing. After the page is printed the lead slugs are taken up and re-melted for further use in the typesetting machine. With this type machine it is necessary to have a different mat for every character in each type face and in different sizes. This requires the machine to have available a very large number of mats. In typesetting parlance the width of each character is expressed in terms of "points." A point is a dimension of approximately $\frac{1}{72}$ parts of an inch. A separate mat must be available for each character in the same line, i. e., if the letter "E" were to appear five times in a line, five E-mats would have to be used in that line by this type machine. A printer using a hot lead machine would need something in the order of 25 to 35 magazines to start in business, and each magazine would normally contain between 1,000 and 1,500 mats. Thus, the printed starting in business would need between 30,000 and 50,000 mats.

In this country there are three major types of printing generally used—letter press process, gravure process, and lithographic or offset process.

The letter press process is the process of transferring from the printed image which is raised above the surrounding material, transferring ink placed on these images to the paper. The distinction of this process is that the characters are raised above the surrounding material. In the gravure process the printed image is recessed below the surrounding surface. To print from this recessed image the entire surface is coated with a liquid ink. The excess ink is scraped off leaving ink in the recess pockets. Then the surface is pressed heavily against the paper or the material to be printed and this in turn causes transfer of the image to the paper.

In the lithographic or offset process the printing plate is neither raised nor

lowered. It is all on one surface, i. e., the image which is to be printed is at substantially the same surface level as the surrounding material. This image uses the well-known condition of water and oil repelling each other and, the image being oil, attracts the ink to it when the ink rollers are rolled over it. The inked image on the plate is then transferred to the paper. However, it is not usually transferred directly to the paper because this does not produce a good result. Usually it is necessary to transfer the image first to a rubber or resilient-coated cylinder and from that resilient surface to the paper. In conventional use of the lithographic process the first step is to cast lines of type or slugs in hot metal, just as is done for the letter press process. After that a single proof sheet is printed from that slug, and then the single proof sheet so printed is photographed in order to get the photographic film needed in offset lithography. The lead slug is then remelted and the proof sheet generally destroyed.

Phototypesetting eliminates the use of hot metal. In this method of printing an operator selects characters by use of a keyboard, causing a character to be projected directly on to a film by means of light rays sent through an opaque background with a transparent character. Next, a photographic negative so prepared is placed on the offset lithographic plate, which is a metal plate with a sensitized surface. It is then exposed to light and thereafter prepared to be put on the press for printing purposes, i. e., photographic typesetting by-passes the entire hot metal operation and makes available directly from the machine the photographic negative from which the lithographic plate can be made.

Experts called by both parties agreed that for commercially acceptable accuracy in spacing characters in a line of printing, the machine must be capable of correctly spacing letters within a tolerance of 2/1000ths of an inch. W. R. Spiller, Vice-President in charge of Research and Engineering at Harris, conceded that accuracy of this magnitude was unobtainable with mechanical contacts of the type shown in the Tansel patent or with any other type of mechanical brushes or contacts.

Mr. Spiller testified that F. J. Hooven, an experienced engineer retained by Harris as a consultant to study the feasibility of developing a phototypesetting machine, reported to Harris, "There is no room for doubt that electronic operation is inherently much more reliable than mechanical in any high speed system involving intermittent operation." Mr. Spiller conceded that samples of the work done on the early Tansel machine were not commercially acceptable typography. He stated that Harris understood the Tansel concept to be a combination of elements involving, first of all, a rotating matrix of characters, a means for projecting flashes of light through these characters to a sensitized surface, a means for advancing the relative position of characters and the sensitized surface in varying amounts depending upon the width of the character desired, and a means for justifying or setting lines of equal length automatically. "Justification" is the process of making of equal length the lines on a page, coupled with word spaces of approximately equal size. To be commercially practical a machine must have some provision for justification.

Mr. Spiller conceded that the justification system shown in the Tansel patents has not been used in any of the developments of machines at Harris. In fact, he testified that Harris does not claim to have ever used any of the equipment described in the Tansel patents, but he testified "we have followed much of the Tansel ideas along through to our present machine." When pressed to particularize, he said that the Tansel ideas which Harris has followed are the ideas of "whirling a disc" and "flashing a lamp."

An examination of the prior art becomes relevant to evaluate the presence or absence of invention in the ideas of "whirling a disc" and "flashing a lamp."

Uher French patents,[1] Nos. 713,075 and 713,076, issued on October 12, 1931, describe a photocomposing machine utilizing a drum which bears characters on its surface. ·A mirror is rotated by stop and start motions to different positions for selection of characters. Control of illumination in this machine is by use of a mechanical shutter. It is now clear that a mechanical shutter cannot attain sufficient speed for commercially acceptable photocomposition.

Highton patent No. 2,351,126, issued June 13, 1944 on an application filed May 5, 1941, describes a photocomposing machine utilizing a continuously rotating disc with means to project characters from the disc on to a film. It shows control of illumination by means of a mechanical shutter.

Eaton patents Nos. 581,815 and 582,157, issued May 4, 1897, although concerned with the field of telegraphy both describe devices in which a moving disc bearing a circle of characters is caused to project characters on to a film. These patents utilized for illumination a magneto optical shutter or Faraday cell capable of producing a very short burst of illumination similar to a modern day strobe flash.

Bryce patent No. 2,364,188, issued December 5, 1944 on an application filed April 1, 1942, discloses a device for projecting characters from a moving character carrier on to a film. This patent relates to an accounting machine provided with improved photographic recording apparatus.

The Uher, Highton, Eaton and Bryce patents put to rest any contention as to novelty or newness of the concept of projecting characters by photographic means from a rotating character carrier on to a piece of photographic film.

A book published in 1939 entitled "Flash," by Professors Edgerton and Killian of M.I.T., which *was not included in the prior art cited to the Patent Of-·fice in connection with the Tansel patents*, contains statements to the effect that flash or strobe illumination may be substituted for mechanical shutters in any device in which the motion sought to be photographed is too fast for a mechanical shutter to "stop," i. e., to photograph clearly.

The realization that strobe or flash photography could be adapted for use in a photocomposing machine came to a Harris employee, Howard A. Pritchard, at least by September 4, 1943 (Defendant's Exhibit M). By April 1944, Pritchard and another Harris employee, Charles W. Harrold, had designed a photocomposing device utilizing flash illumination in lieu of a mechanical shutter.

Louis F. Moyroud, an employee of Photon, conceived the idea for using a strobe flash light in a photocomposing machine in September 1944 when shown a photograph of a Pelton Turbine whirling at very high speed which appeared stationary because it had been photographed with a stroboscopic flash which "stopped" its motion.

Professor Edgerton had stopped high speed objects by stroboscopic photography as far back as 1931, and numerous examples of the use of this equipment appear in the Edgerton and Killian book "Flash" referred to above.

The fact that Tansel, Pritchard, Harrold, Higonnet and Moyroud all realized that the disclosures set out in "Flash" could be adapted for use in a photocomposing machine is persuasive evidence that the substitution of strobe light for a shutter is a normal development in the art, not involving invention. Abbott Machine Co. v. Universal Winding Co., 137 F.2d 166 (1 Cir. 1943) ; Graham v. Jeoffroy Mfg. Inc., 206 F.2d 769 (5 Cir. 1953) ; Wilson Athletic Goods Mfg. Co. v. Kennedy Sporting Goods Mfg. Co., 233 F.2d 280 (2 Cir. 1956)

Additional evidence that no invention is involved in substituting pulse-trig-

---

1. These patents are summarized in an article written in the English language which appeared in the "Inland Printer," in March 1931 under the title "Information as to the Uher Type Photocomposing Machine." (Plaintiff's Exhibit 79.)

gered strobe light-flashes for the slower mechanical shutter is contained in the observation of the Patent Office Examiner in a written report filed on August 4, 1943, which was cited by Photon as part of the prior art (and may be found at page 29 of Defendant's Exhibit O, a photostatic copy of the file history of Highton patent No. 2,351,126). The Examiner said:

"Whether the instantaneous exposure is made by tripping a shutter or by tripping a flashing light source is immaterial, both types of control means being well known and widely used in the art."

It is significant to note that plaintiff Harris did not come into court and offer evidence of having previously marketed a machine based on the Tansel patents which has enjoyed any commercial success whatsoever and which it claims defendant has pirated. Nor has Harris produced any evidence of a long-felt want in the trade for this type of machine. Despite the fact that there has been admitted in evidence advertising material emanating from Photon, and a number of articles or portions of articles from journals in the printing trade and related industries, to the general effect that the development of photocomposing machines is a historic landmark in the printing trade comparable in importance to the contributions of Gutenberg in his development of movable type and of Mergenthaler in his development of the linotype, the evidence offered at the trial indicates that as of this date these statements are grossly over-optimistic and that, in fact, the trade has not opened either its arms or its pocketbook to welcome these newcomers whose role in the printing industry today remains numerically insignificant.

Harris seeks to draw comfort from the observation at the beginning of the opinion of the Court of Customs and Patent Appeals filed on June 30, 1954 (215 F.2d 457, 458) that invention of the Tansel patents is regarded as "a fundamental advance in the printing art." In the absence of an indication by that Court of the identity of the party or parties who so regard this development, I am not persuaded by this observation to the belief that the Tansel concept amounts to invention. Nor am I persuaded that any significant element of those engaged in the printing industry so regard it. The evidence adduced at the trial of the instant cases is to the contrary. It shows that despite the lapse of time since the filing of the Tansel application in 1945, almost twenty years ago, no machines have been successfully marketed on the basis of the Tansel disclosures. The evidence also shows that Photon has sold only about 120 photocomposing machines in the twenty years that have elapsed since Higonnet filed his French application on July 11, 1944. The record shows that Photon sold the first Series 100 machine on March 1, 1956 and the first Series 200 machine on November 1, 1956.

I am satisfied, on the basis of the testimony of the witnesses and the documentary evidence admitted during the trial, that all of the elements contained in the claims in issue of the Tansel '523 and '803 patents for a photocomposing machine were old, i. e., keyboard, register, justification system, variable width device, rotating character carrier and flash illumination, and that the patents in suit call for nothing more than a combination of said old elements with no change in their respective functions.

I am satisfied that plaintiff has failed to show that the elements of the combination cooperate in such a way as to produce new, novel, or unexpected results. On the contrary, I am persuaded that defendant has clearly shown the absence of any new, novel, or unexpected results from this combination of old and known elements and procedures. Consequently, I find both Tansel patents are invalid for lack of invention.

I am not persuaded, however, that invalidity of the Tansel patents should be premised on the other grounds of invalidity urged by defendant, such as prior inventorship by Harrold and Pritchard, double patenting, and inequitable conduct of plaintiff in allegedly withhold-

ing information from the Patent Office with respect to activities of Harrold and Pritchard.

Because of the obvious likelihood of appellate action in a case of such substantial economic significance to the litigants, I pass now to the question of infringement, solely to obviate the necessity of a second appellate procedure in the event that the foregoing findings and rulings as to invalidity of the Tansel patents are set aside on appeal.

From the pre-trial discovery which took place in this case it is perfectly clear that every one of the claims charged to be infringed herein reads on the Photon machine. Defendant has sought to avoid the otherwise inescapable conclusion of infringement deducible from its various answers to plaintiff's requests for admissions by asserting, with respect to Claim 9 of the Tansel '523 patent, that its machines have a different mode of operation from that called for in the Tansel patents and that, therefore, there is no infringement. To particularize, defendant contends that the operation of the rough control interval and the precise control interval features in the two machines is so different as to preclude infringement. Defendant says that the difference between the machines resides in the means whereby precise placement of characters on a film can be obtained by the two competing machines.

Defendant relies on Westinghouse v. Boyden Power-Brake Co., 170 U.S. 537, 18 S.Ct. 707, 42 L.Ed. 1136 (1898) and Holtzer-Cabot Electric Co. v. Standard Electric Time Co., 111 F.2d 71 (1 Cir. 1940), for the proposition that if its machine has a different mode of operation from what is shown and described in the plaintiff's patent it has not infringed the patent. Defendant argues in its trial brief that the pulse-generating system by which the necessary precision is obtained in the Photon machine is a different mode of operation from Tansel's breaker point device; that satisfactory timing was not obtainable through Tansel's breaker point device and that the problem of obtaining the necessary degree of

precision for commercial purposes was not solved until Higonnet and Moyroud produced the precise timing device which utilized the slits in the rotating disc for generating a pulse for each and every character.

At the trial, the defendant's expert, Dr. Truman S. Gray, a specialist in the field of vacuum tubes and electronic instrumentation and measurements, including flash photography, and a Professor at the Graduate School of Electrical Engineering at M.I.T., testified that there is a difference in the mode of operation between the machine described in the Tansel patents and the allegedly offending Photon machine, and he testified at length in explaining certain diagrams depicting the differences in operation of the competing machines. Because my ruling on infringement is based principally on the testimony of Dr. Gray, which I accept and believe, relevant portions of his testimony are set forth herein at some length.

Dr. Gray testified that the pulse theory is a particularized branch of the field of electrical engineering which now permeates a large area in the electronic field. He stated that during World War II, radar, which is a pulse application, gave tremendous impetus to the development of pulse techniques, and that he became interested in the subject in connection with the nuclear instrumentation field shortly after World War II and that he has dealt with pulses i ι connection with instrumentation for nuclear reactors and nuclear rocket propulsion. He stated that there are electrical characteristics of pulse circuits that are necessary and desirable for the control of flash-timing in systems like that contained in the Photon machine. He explained that a pulse is characterized by three factors: rise time, i. e., the time it takes the pulse to start from some low value and reach some high value; pulse height, i. e., the maximum value; and decay time, i. e., the rate at which the pulse falls off from that maximum. One pulse alone is useless. Where a pulse is intended to trigger the flash of a tube at some point in

the system, a triggering level or threshold is established. The pulse fires the flash at and above this point but not below it. When the pulse passes over the threshold the firing of the device occurs. Thyratron tubes, which are used in these systems, are erratic. An engineering solution which eliminates the erratic factor of the thyratron is produced by steepening the rate of rise in the pulse since if the pulse can be made perfectly steep the time at which the threshold is crossed is not dependent on where the threshold is.

Professor Gray expressed the opinion that the desired steep rise is obtainable through the use of photocell and slit, coupled with an amplifier, but is not obtainable with a mechanical break-type contact.

With particular reference to the language of Claim 9 of the Tansel '523 patent:

"A rough control device and a precise control device for the circuit, both synchronized with the character carrier, the rough control device determining the interval in which a discharge is to occur and the precise control device determining the precise instant of discharge within said interval,"

Professor Gray examined the wiring diagram of the Photon machine (Plaintiff's Exhibit 73) and said that the diagram shows a rough control device, and that said rough control device determines an interval in which a discharge is to occur. He testified that the term "gate" is the more common term nowadays for a device that determines the interval in which something else may occur and that the function here of the gate, or rough control, is to open the gate so that something else can pass through.

Dr. Gray then stated that he found in the Photon diagram a precise control device, the rotating carrier with slits, a lamp and photocell. The sequence of operation is that once the gate (rough control device) is opened, the next succeeding pulse from the light passing through

the slit will fire the flash unit. He said the function of the gate is to eliminate all characters that precede the desired one, i. e., the gate should not open until the character just preceding the one desired has passed by, and it should close before the one succeeding the chosen character arrives. The chief function of the gate is to eliminate all unwanted characters, and the function of the precise timing device is to correctly position the desired character. He further testified that both the rough and the precise control devices in the Photon machine are synchronized with the character carrier.

Professor Gray then expressed the opinion that the gating function, which is the rough control device in Figure 19 of the Higonnet and Moyroud machine, *is absent in Tansel patent '523*. He then made a diagram illustrative of the operation of the rough and precise controls as they exist in the Photon machine—motion from the left side to the right side of the diagram representing the passage of time. In the Photon machine, slits are passing an aperture at the same time that letters or characters are passing the position of the projection, so that at a given early time the letter A might pass the position of projection, next the letter B, then C, etc. At some time, the register supplies information to the selector switches which determine the identity of the next letter to be photographed, so that at an instant of time switches have been closed establishing the selection desired. The position of the switches determines which letter is the next one to be photographed. Assuming for illustration it is the letter G: once the appropriate switches are closed the continuously rotating character carrier continues its rotating and the letters C, D, E and F pass by the position of projection. At this instant, additional switches operate so as to open the "gate" and permit the equipment to photograph the letter G, which is the next letter coming along on the rotating character carrier. The opening of the gate is not in itself sufficient to insure the correct position of the letter G. In order to insure precise posi-

tioning, it is necessary to have an additional pulse occur at the precise instant *within the interval* during which the gate is open. Professor Gray restated this in another way by saying: "We first set the selector switches, then open the gate, then impress the pulse on the system, and a very short time thereafter a flash occurs."

There are three time intervals involved in the foregoing, starting with the instant at which selection is established with the closing of the appropriate switches. Interval No. 1 is the time between the closing of the switches and the opening of the gate. Interval No. 2 is the time from the instant the gate opens until the precise timing pulse occurs. Interval No. 3 is the time from the precise timing pulse until the actual flash occurs.

Professor Gray stated that the rough control interval is the period from the time the gate opens until the time it closes and that the precise control interval is the time from the pulse until the actual flash. He concretized these intervals with the following example: Assume that a rotating character carrier has 100 characters around its circumference and that each character has its own slit and that the character carrier completes ten revolutions per second. This means that a pulse from the slits for all 100 characters would occur in one-tenth of a second (100,000 microseconds), i. e., one-tenth of a second is the elapsed time from the point when the slit assigned to the letter G crosses a pulse until the next time that that same slit crosses another pulse for that same letter. Consequently, the time that any one letter remains in the aperture of the slit (i. e., the time during which the gate for that letter remains open) is ⅟₁₀₀th of one-tenth of a second, or 1,000 microseconds. This is the duration of the rough control interval. The precise control interval is much shorter than that, in the order of 3 or 4 microseconds.

Professor Gray testified that in the Photon machine, as indicated above, the precise control interval occurs during the duration of the rough control interval, i. e., within the rough control interval, i. e., in accordance with the language of Claim 9 of the Tansel '523 patent, "the precise instant of discharge (is) within said interval."

Dr. Gray then testified that in his opinion the mode of operation of the Tansel disclosure is different; that there are two time intervals rather than three present in the Tansel disclosure; and that in Tansel the rough control interval does not span the precise control interval, i. e., that the precise control interval is not, as required by Claim 9 of the '523 patent, within the rough control interval. Dr. Gray said, "My understanding is that the rough control interval ends when the precise control begins, there is no overlap, and this is inconsistent with the gating function." He also testified that the precise control interval occurs after the rough control interval rather than within it. He expressed the opinion that the difference between the two systems is a degree of precision which separates the commercially acceptable accuracy of character-placing from the commercially unacceptable.

To the extent that there is a conflict between the testimony of Professor Gray and the testimony of the witness Emil A. Scardato produced by Harris, I credit the testimony of Professor Gray. I am not persuaded that Harris has sustained its burden of proving that the Photon machine infringes either of the Tansel patents in suit due to the difference in their mode of operation as explained by Professor Gray, despite the admitted fact that the literal terms of the Tansel claims can be applied to the Photon machines.

In Civil Action No. 60–412, the complaint filed by Harris alleging infringement of Tansel patents No. 2,725,803 and No. 2,896,523 is dismissed.

In Civil Action 60–219, judgment for plaintiff Photon declaring:

1. that Tansel patents 2,725,803 and 2,896,523 are invalid;

2. that use or sale by Photon or its customers of the photocomposing ma-

chines hitherto and now being manufactured by Photon constitute neither direct nor contributory infringement of patents 2,725,803 and 2,896,523; and

3. that the defendant Harris, its agents, attorneys, employees, and all those privy to it or subject to its control, are permanently enjoined and restrained from asserting that any of Photon's customers infringed Tansel patents No. 2,-725,803 and 2,896,523, and from bringing, threatening to bring, or prosecuting any claim, suit, action, or proceeding against Photon or any of its customers charging infringement of the said patents.