**ITEK CORPORATION, Plaintiff,**

v.

**INFORMATION INTERNATIONAL, INC., Defendant.**

Civ. A. No. 77–2958–C.

United States District Court, D. Massachusetts.

Sept. 27, 1979.

---

George E. Kersey, Annandale, N. J., Robert L. Nathans, Itek Corp., Lexington, Mass., for plaintiff.

Robert D. Hornbaker, Arthur Freilich, Freilich, Hornbaker, Wasserman, Rosen & Fernandez, Los Angeles, Cal., Foley, Hoag & Elliott, David W. Walker, Boston, Mass., for defendant.

## OPINION

CAFFREY, Chief Judge.

This matter came before the court for a nonjury trial. After the close of the evidence, the parties filed written requests for findings of fact and conclusions of law. The requests were supported by memoranda of law.

Upon consideration of evidence adduced at trial, the requests for findings and the request for rulings, I reject plaintiff's request for findings of law and accept, and as modified herein, adopt the defendant's request for findings of fact as the court's findings of fact.

## FINDINGS OF FACT

1. This is an action by plaintiff Itek Corporation against defendant Information International, Inc. for infringement of Troll U.S. Patent No. 3,165,045, hereafter called the Troll patent, entitled "Data Processing System", issued January 12, 1965, to Itek Corporation, on an application filed April 5, 1962, and this court has jurisdiction under Section 1338(a) of Title 28, United States Code.

2. The Troll patent relates primarily to photo typesetting. Troll had very little skill in the art prior to starting work on his invention. Neither Troll, nor Itek, has made a photo typesetter in accordance with the Troll patent.

3. Troll failed to prove an invention date earlier than his filing date of April 5, 1962.

4. Defendant proved the publication, prior to April 5, 1962, of the following printed publications, under Section 102(a) and (b) of Title 35, United States Code: article in June 1960 issue of *Automatic Control,* entitled "New High Resolution Symbol Generator," not cited by the Patent Office; article in June 10, 1960 issue of *Electronics,* entitled "Generating High-Quality Characters and Symbols," not cited by the Patent Office; brochure entitled "CBS Laboratories VIDIAC GA–1000 Graphic Arts Composer Printer," dated May 5, 1961, not cited by the Patent Office; article entitled "Computer Output Printing of Graphic Arts Quality" by J. Kenneth Moore, Department Manager, Digital Systems CBS Laboratories, a division of Columbia Broadcasting Systems, Inc., not cited by the Patent Office, in the Proceedings of the Technical Association of the Graphic Arts (TAGA), Thirteenth Annual Meeting, June 12–14, 1961, and in SYMPOSIUM, a collection of papers presented at said meeting, Stanford Research Institute Proposal, and an article received by the Institute of Radio Engineers on November 2, 1970 entitled "Computer Generated Displays."

5. Each of the claims, defining photo typesetting apparatus, calls for nothing more than a combination of elements shown

by the prior art to be old, and producing no unexpected result.

6. In an action, mailed June 10, 1963, the Patent Office Examiner John M. Horan rejected application claim 1, as originally filed, as not defining invention over Peery U.S. Patent No. 2,787,654, nor over Dinga U.S. Patent No. 2,624,798.

7. An Amendment "A", dated December 5, 1963, Troll amended application claim 1 as follows, with additions in underlining and deletion in brackets:

"1. Photo typesetting apparatus comprising, in combination, a _magnetic type font_ first storage medium storing the characters in the form of a _binary_ [digital] representation indicating which elements of the characters are to be printed, means for reading from said first medium a line comprising selected ones of said characters, means for justifying said line and recording it on a second _magnetic storage_ medium, and output means for reading the justified line from said second medium and recording it on a light sensitive medium, said output means being arranged to record said line element-by-element."

In Amendment "A", Troll said:

"The invention of the subject application involves a _magnetic type font,_ (which may be in the form of drum), which stores the various characters in a coded magnetic form. When a particular character is desired, the appropriate key on the keyboard is depressed causing the character to be read out of the type font drum in a _binary_ presentation and then presented to a line memory unit (which line memory unit may also take the form of a magnetic drum).

"The keyboard also emit justification information in the form of a signal corresponding to the length of each character to be printed in a line, and a second signal that is used to count the number of spaces between the words appearing in the line. This information is processed by a justification computer which adds this information to the line previously stored in the memory unit and the now justified lines are stored in a justification memory unit. Thereafter, the justified lines in the justified memory unit are processed by an ultrasonic read out unit for subsequent recording on light sensitive film.

"Claim 1, as amended, now calls for the combination of a _magnetic type font_ storage medium which stores the characters in the form of a _binary_ presentation, with means for reading characters from the _magnetic type font_ storage medium and placing it in a line in a second magnetic memory medium, with means for justifying the lines and recording the now justified lines in another medium and with output means for reading the justified lines and recording it.

"Neither Peery or Dinga, used to reject Claim 1, show a _magnetic type font_ storage medium for storing the characters in a _binary_ presentation. Both Dinga and Peery have master type disks in which the digital or character information is stored for subsequent removal therefrom by either a beam of light (Peery) or by a beam of electrons (Dinga) in a typical cathode ray tube. Certainly, the mechanical font 16 of Peery cannot be considered the equivalent of Applicant's _magnetic font_ since the characters are not in the form of a _binary_ presentation nor is it utilized as the font from which the information character is selected. Claim 1 specifically calls for a _magnetic type font_ as being the first storage medium.

\* \* \* \* \* \*

"Similarly, Dinga does not show the _magnetic type font_ nor can the font's 11a or 11b be considered in any way equivalent to a _magnetic type font_ capable of storing the characters in the form of a _binary_ presentation.

\* \* \* \* \* \*

"It is, therefore, submitted that Claim 1 patentably defines over both Peery and Dinga both singly and in combination and is allowable.

(Underlining added)

In a Notice of Allowance, mailed November 2, 1964, Patent Office Primary Examin-

er Norton Ansher allowed application claim 1, as amended, and renumbered it claim 1 of the patent.

8. Claims 2 and 3, dependent on claim 1, contain the same limitations as claim 1; claim 4, and dependent claims 5, 6, 7 and 8, are also so limited, that is, to "a type font comprising a first magnetic memory storing the characters in the form of rows of elements corresponding to rows of elements of the printed characters, each element in said first memory having a first magnetization if it is to be printed and a second magnetization if it is not to be printed, a second magnetics memory . . . [and] a third magnetic memory"; claim 9, and dependent claims 10 and 11, are likewise so limited, that is, to "a type font in the form of a first magnetic memory in which the characters are recorded in rows of elements corresponding to rows of elements of the printed characters, each of said elements in said first memory having a first magnetization if the element corresponds to a printed element and a second magnetization if it corresponds to an unprinted element . . ."

9. Gordon U.S. Patent No. 2,920,312, not cited by the Patent Office, discloses, in Fig. 4, and describes, a magnetic core character generator, which is "a magnetic type font first storage medium storing the characters in the form of a binary representation indicating which elements of the characters are to be printed," as defined in claim 1. Gordon discloses the essence of Troll's invention. Gordon also describes, at column 12, line 63 to column 13, line 5, the use of a magnetic core character generator in a photo typesetter. The article in the June, 1960 issue of *Automatic Control,* entitled "New High Resolution Symbol Generator," not cited by the Patent Office, also describes a magnetic core character generator. It states that "a word-oriented, wire-program type of memory with non-critical ferrite switch cores to store the character shapes is used." The article further describes the use of the magnetic core character generator in a photo typesetter:

"Four ultra-high speed number, character and symbol generators which provide outputs comparable to fine printing are being built by CBS Laboratories for use in Thompson-Ramo-Wooldridge's new military data processing systems.

"Circuitry in the VIDIAC units takes the place of the metal type fonts and graphic originals used in previously-developed generators. Its output appears as brightly displayed words, numbers and pictures on the screen of a cathode ray tube. A permanent record can be produced through the use of any one of the existing photographic or electrostatic systems.

"The fundamentals of VIDIAC were developed by Marvin Kronenberg and J. Kenneth Moore, Section Heads in the Military and Industrial Systems Department, CBS Laboratories. Actual development of the Character Generator took place under the direction of Mr. Moore, Head of CBS Laboratories' Digital Techniques Section and a specialist in transistor and magnetic core digital computer techniques.

"For a system requiring exceptionally high quality read-out, symbols of graphic arts quality with 5,000 television picture elements of resolution may be generated at a rate of 1,000 characters per second. Such a system could utilize as many as 5,000 individual characters and symbols, making possible a wide variety of graphic arts applications. In a general purpose display system, 300 different characters of typewriter quality could be used at writing speeds up to 25,000 characters per second. Each such character would have a resolution in excess of 280 television picture elements.

"In a high speed system, 150 different characters, each with 100 television picture elements (equivalent to mechanical line printer quality) can be displayed at a rate of 100,000 characters per second. This would fully meet the requirements of the latest high speed computers."

The brochure entitled "CBS Laboratories VIDIAC GA–1000 Graphic Arts Composer Printer, dated May 5, 1961, not cited by the

Patent Office, further describes, at pages 2–2, 2–6, and 2–16, the magnetic core character generator, and its use in photo typesetters. In addition, J. Kenneth Moore published an article, entitled "Computer Output Printing of Graphic Arts Quality," in the Proceedings of the Technical Association of the Graphic Arts (TAGA), Thirteenth Annual Meeting, June 12–14, 1961, and in the SYMPOSIUM, a collection of papers presented at said meeting, in which he described, at pages 213–219, a magnetic core character generator, and its use in a photo typesetter. So the prior art, not cited by the Patent Office, describes the distinguishing features clearly incorporated in the claims.

10. Dinga U.S. Patent No. 2,624,798, describes a photo typesetter, including a pair of Monoscopes, or character generating tubes 11, 12.

11. Gordon U.S. Patent No. 2,920,312, discloses, at column 2, line 57 to column 3, line 3, that a magnetic core character generator can be substituted for the monoscopes in Dinga. Also, an article, received by the Institute of Radio Engineers (IRE) on November 2, 1960, entitle "Computer Generated Displays," at pages 188–189, and in Figs. 4 and 5, that a magnetic core, or magnetic drum, character generator can be substituted for the monoscopes in Dinga. In addition, Marvin Kronenberg and J. Kenneth Moore recognized as early as 1958 that a magnetic core character generator could be substituted for monoscopes, in photo typesetters.

12. Claim 1, and dependent claims 2 and 3, are vague and ambiguous.

On the basis of the above findings of fact, I make the following conclusions of law:

1. Troll's invention date is the filing date of his application, April 5, 1962. *Cleeton v. Hewlett-Packard,* 343 F.Supp. 1215, 1218–1219 (D.Md.1972), *aff'd,* 457 F.2d 1399 (4th Cir. 1973).

2. The claims of Troll U.S. Patent No. 3,165,045 are invalid for lack of invention, because each claim calls for nothing more than a combination of elements shown by the prior art to be old, and producing no unexpected result. *Harris-Intertype Corporation v. Photon, Inc.,* 235 F.Supp. 921, 923, 927 (D.Mass.1964), *aff'd,* 349 F.2d 856, 857 (1st Cir. 1965), *cert. denied,* 382 U.S. 1011, 86 S.Ct. 621, 15 L.Ed.2d 527 (1965).

3. In this case patentee obtained his patent only by accepting the limitations imposed by the examiner. The claims were carefully limited to reflect these limitations and plaintiff is not now free to assert a broader view of Troll's invention. The subject matter as a whole reduces, then, to the distinguishing features clearly incorporated into the claims. Since these features are found in prior art, not cited by the Patent Office, the patent is invalid, under Section 103 of Title 35, United States Code. *Graham v. John Deere,* and *Calmar v. Cook Chemical,* 383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).

4. The differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made, April 5, 1962, to a person having ordinary skill in the art to which said subject matter pertains, under Section 103 of Title 35, United States Code.

5. Claim 1, and dependent claims 2 and 3, are invalid for failure to particularly point out and distinctly claim the subject matter which Troll regarded as his invention, under the second paragraph of Section 112 of Title 35, United States Code.

On the basis of the above findings and conclusions, an order will issue dismissing plaintiff's complaint.