STAMICARBON, N.V., a corporation,
Plaintiff,

v.

ESCAMBIA CHEMICAL CORPORA-
TION, a corporation, Defendant.

PCA 1559.

United States District Court
N. D. Florida,
Pensacola Division.

Jan. 27, 1969.

Carl Love of Cushman, Darby & Cushman, Washington, D. C., for plaintiff.

Charles Brown of Pennie, Edmonds, Morton, Taylor & Adams, New York City, for defendant.

## FINDINGS OF FACT

ARNOW, District Judge.

1. Plaintiff, STAMICARBON, N.V., is a corporation of the Netherlands, having its principal place of business at Heerlen and Geleen, the Netherlands. It has no offices or place of business in the United States.

2. Defendant, ESCAMBIA CHEMICAL CORPORATION, is a Delaware corporation, having a regular and established place of business at Pace, Florida, and is a subsidiary of the Electric Bond & Share Corporation.

3. Plaintiff charges Defendant with infringement of claims 1 to 3 of patent No. 2,727,069 and Defendant contends that those claims are invalid and not infringed.

4. The general subject of the patent and the art to which it relates is a method for minimizing corrosion of stainless steel equipment in apparatus for manufacturing urea.

5. By agreement between the parties approved by the Court, the trial of this case has been split, with the case initially tried on the issue of liability only. Trial on that issue has now been completed.

6. The following facts have been stipulated between the parties, and are agreed statements of facts, requiring no proof of any kind in regard to this case:

A. United States Letters Patent No. 2,727,069 were granted on December 13, 1955, to Joseph P. M. van Waes, who was assignor to Stamicarbon, N.V., Heerlen, Netherlands, the Plaintiff in this suit. These Letters Patent were granted upon an application filed in the United States Patent Office on April 9, 1954, under Serial No. 422,263. The application claimed the benefit of its priority date based upon an application made in the Netherlands, filed April 15, 1953, under the provisions of Title 35, United States Code, Section 119, and under the International Convention for the Protection of Industrial Property (53 Stat. 1748).

B. The Assignment of all rights of Joseph P. M. van Waes in the invention in United States Patent 2,727,069 was made to Stamicarbon, N.V. in a document identified as Plaintiff's Pre-trial Exhibit No. 61, and duly recorded in the United States Patent Office under the provisions of Title 35, United States Code, Section 261.

C. The Defendant Escambia Chemical Corporation owns and operates a plant for the manufacture of urea ($NH_2CONH_2$), which plant reacts ammonia ($NH_3$) and carbon dioxide ($CO_2$) together in order to manufacture such urea.

D. The reaction is conducted in a "reactor" or "autoclave".

E. In the "reactor" or "autoclave", the said ammonia and carbon dioxide reactants are brought together under reaction conditions to form a "urea-carbamate melt" reaction product. This "melt" has been recognized in literature for years prior to the priority date of the patent in suit as a corrosive chemical material.

F. The internal surfaces of said "reactor" or "autoclave", of Defendant's plant, which are exposed to the reactants, are composed of a chromium-nickel alloy stainless steel, which has the following alloy constitutents which fall within the ranges indicated:

| | |
|---|---|
| Chromium | 16–18% |
| Nickel | 10–14% |
| Molybdenum | 2–3% |

G. The Defendant Escambia Chemical Corporation also operates its urea plant so that the reaction of the ammonia and $CO_2$ to form the "melt" is conducted in the presence of an amount of oxygen which falls within the range of 0.1 to 3% by volume of the carbon dioxide used.

H. The Defendant Escambia Chemical Corporation urea plant has an alarm system installed to indicate if the oxygen addition to the carbon dioxide feed stream to the reactor or autoclave is for any reason interrupted.

I. The Defendant's urea plant was designed by and erected pursuant to a contract between the Defendant and Chemical Construction Corporation.

J. The Chemical Construction Corporation never built a urea plant using a reactor having its internal surfaces exposed to the reactants lined with a stainless steel prior to the priority date of the patent in suit.

K. Defendant Escambia Chemical Corporation and the Chemical Construction Corporation are both subsidiaries of the Electric Bond & Share Corporation. The defense of this civil action has been openly conducted by the Chemical Construction Corporation, which has agreed to indemnify the Escambia Chemical Corporation against patent infringement with respect to the operation of accused urea plant.

L. Acetic acid has long been known to have a boiling point of 118° C at standard atmospheric pressure.

M. Insofar as the van Waes patent is concernèd, the "time the invention was made" under 35 U.S.C. § 103 is April 15, 1953.

N. The process used by the Defendant is identical with the claims of process set forth in Claims 1, 2 and 3 of Plaintiff's patent, except that Defendant contends its process is not substantially free of sulphur. The percentage of sulphur found in the process used by the Defendant at the time of the institution of this suit, and until recently, when the Defendant contends it has changed the amount, is within the range 0.1 ppm to 0.2 ppm total sulphur in carbon dioxide, and the total sulphur in the carbon dioxide is from .00001 percent to .00002 percent.

The quantities and percentages of sulphur in Plaintiff's patented process are as follows:

The quantities of sulphur referred to in Plaintiff's patent are 2 mg. of sulphur per $m_3$ of $CO_2$ and 5 to 10 mg. per $m_3$ of $CO_2$ (page 1, column 2, lines 35, 36).

On the basis that 1 mg. per $m_3$ equals 0.5 ppm, then 2 mg. per $m_3$ equals 1 ppm, and 5–10 mg. per $m_3$ equals 2.5–5 ppm.

1 ppm. equals 0.000001, or .0001%.

Therefore, 2.5–5 ppm equals .00025%–.0005% and these are the percentages for the corresponding quantities of sulphur given above.

7. Prior to instituting this civil action, Plaintiff had given both the Escambia Chemical Corporation and the Chemical Construction Corporation written notice of the accused infringement, such notice having been originally given in July of 1961.

8. For a number of years prior to date of the invention of the patent in suit, the publicly known and used processes for the manufacture of urea employed reaction vessels or "autoclaves" which were lined with silver or lead metal to avoid the corrosion problem.

9. Silver-lined apparatus is expensive to fabricate and is not generally selected by persons skilled in the art as a preferred material of construction for chemical apparatus unless its use is necessary. Furthermore, the use of silver-lined equipment requires careful purification of the reactants, especially with respect to the removal of oxygen from the carbon dioxide.

10. Lead-lined apparatus is also difficult to fabricate, and maintain, and suffers from the added disadvantage that it cannot be used at the relatively high temperatures at which urea-forming reaction proceeds most efficiently. (e.g., 180–200° C).

11. The invention of the van Waes patent in suit permits the use of apparatus fabricated with stainless steel liners exposed to the corrosive carbamate melt, while corrosion is controlled by the addition of small amounts of oxygen. Specifically, claim 1 recites the alleged improvement in the synthesis of urea wherein gaseous ammonia ($NH_3$) and carbon dioxide ($CO_2$) are reacted in a form substantially free of sulphur and sulphur compounds, using relatively high temperatures and pressure and apparatus having chromium-nickel steel surfaces exposed to the reactants and reaction conditions, and wherein a normally corrosive carbomate melt is obtained as an intermediate product. The alleged improvement comprises (a) effecting the synthesis in the presence of from 0.1 to 3%, by volume, of oxygen based on the amount of $CO_2$ utilized, and (b) using for the chromium-nickel steel surface a chromium-nickel steel containing at least 16% chromium and at least 8% nickel. Claim 2 further states that the chromium-nickel steel should be austenetic and contain 16 to 20% chromium, 10 to 14% nickel and 1.75 to 4% molybdenum or zirconium. Claim 3 further states that the oxygen should be in the form of molecular oxygen. When the urea-forming reaction is conducted in such apparatus, with oxygen maintained within the stated limits of the patented invention, corrosion of the apparatus is minimized, and may be substantially avoided.

12. The application which issued as the patent in suit was originally filed

with a first claim such as that summarized above except that the particular range of oxygen eventually recited was defined simply as "a small amount of oxygen." The patent office rejected this original claim on de Ropp et al. patent No. 2,680,766, which taught the removal of oxygen to below a maximum tolerance of 10 ppm. Since 10 ppm is "a small amount of oxygen" the patent office apparently took the position that this quantitative description of the oxygen content was too imprecise to teach the essential feature of the invention and as written was literally anticipated by de Ropp. It was pointed out, therefore, that the "claim must recite" that a significant amount of oxygen is necessary to prevent corrosion. Accordingly, the original claim 1 was modified to teach the addition of from .1 to 3% oxygen by volume based upon the amount of carbon dioxide utilized and the case was allowed, and the patent issued.

13. Plaintiff, Stamicarbon, N.V., has designed, and there have been installed, many urea-manufacturing plants over the world based upon and using the process claimed in the van Waes patent in suit; such plants have a total production capacity of well over 6,000,000 tons of urea per year, and this is the most widely used urea process in the world.

14. The evidence is persuasive and establishes that Joseph P. M. van Waes is the first and true inventor of the concept of the addition of a small amount of oxygen to control corrosion in stainless steel equipment utilized in the synthesis of urea, as taught in United States patent 2,727,069.

15. The description of the invention of the patent in suit is set forth in full, clear, concise and exact terms, understandable to persons skilled in the area of urea manufacture, so as to enable them to make and use the same.

16. The evidence is not persuasive that the inventive subject matter defined by the claims of the van Waes patent in suit was publicly known or used or on sale by others in this country prior to April 15, 1953.

17. The inventive subject matter defined by the claims of the van Waes patent in suit was not patented in the United States or any foreign country prior to April 15, 1953.

18. The inventive subject matter defined by the claims of the van Waes patent in suit was not described in any printed publication in the United States or in any foreign country prior to April 15, 1953.

19. The inventive subject matter defined by the claims of the van Waes patent in suit was not patented either by the applicant or his legal representatives or assigns in any country prior to April 15, 1953.

20. The inventive subject matter defined by the claims of the van Waes patent in suit was not described to another in any United States patent filed before April 15, 1953.

21. The invention defined by the claims of the van Waes patent in suit was not made in this country by another, who had not abandoned, suppressed or concealed it prior to April 15, 1953.

22. Although it was known in the published literature prior to April of 1953 that oxidizing agents could be employed to control corrosion of stainless steel apparatus used in reducing environments and that certain oxidizing agents had been successfully employed to maintain passivity of the stainless steel apparatus in the synthesis of urea, the use of oxygen as described in the patent in suit cannot be considered obvious in view of the evidence indicating that: (a) Oxygen is a relatively mild oxidizing agent and the synthesis environment is extremely corrosive; (b) the corrosion phenomenon is known to intensify as temperature and pressures are highly elevated; (c) the prior art references teach the removal of oxygen, and characterize its presence as "harmful" and teach the removal of the "oxide film" before using stainless steel in urea appa-

ratus—all in documents which teach the use of other relatively expensive oxidizing agents such as cupric oxide.

23. The evidence is not persuasive that Charles Cramer, the Inventa Company, Vulcan-Cincinnati Company (or their predecessors or related companies), or any of them, knew of or were possessed of the inventive subject matter of the claims of the van Waes patent in suit prior to April 15, 1953; it is persuasive that if they, or any one, did have knowledge of such subject matter, it was at all times prior to at least April 15, 1953, maintained as a closely guarded trade secret and as confidential proprietary information undisclosed in any fashion.

24. The evidence is not persuasive that Shigeru Kijima knew of or had conceived of the inventive subject matter defined by the claims of the van Waes patent in suit at any time prior to April 15, 1953; it is persuasive that all such knowledge as he did have with respect to the corrosion of stainless steels by the urea-carbamate melt was maintained "secret", undisclosed to persons outside of his company and its close affiliates, and never made public at any time prior to April 15, 1953.

25. The evidence of work by the witness Kijima does not show that he had been successful in solving the problem of protecting stainless steels having at least 16% chromium and at least 8% nickel in the alloy composition against the corrosive effects of the urea-carbamate melt. In fact, all of Kijima's work with such stainless steels still resulted in corrosion under the reaction and test conditions at an unacceptably high rate.

26. There is no evidence indicating that F. H. Keating ever conceived of or tested the possibility of using a stainless steel-lined reactor or autoclave for the urea synthesis reaction. To the extent that Keating employed oxygen to control corrosion of a stainless steel pipe downstream of the reactor, in all knowledge made public of such work, there was consciously and deliberately concealed the fact that it related to urea manufacture. The two "communications" by Keating, which are contained in Pretrial exhibits DC–1 and DC–2, do not reveal any information from which one could clearly or inescapably, or even obviously, conclude that the manufacture of urea was involved in the operations described in such documents.

27. The Defendant's plant for the manufacture of urea involved herein has been operated according to the process conditions set forth and defined in each of claims 1, 2 and 3 of the van Waes patent in suit, the urea being manufactured from ammonia and carbon dioxide so that the surfaces exposed to the corrosive urea-carbamate reaction melt are an alloy of stainless steel comprising from 16–20% chromium, 10–14% nickel and 1.75 to 4% molybdenum in the presence of molecular oxygen in an amount from 0.1 to 3% by volume, based on the amount of carbon dioxide utilized. Such process has been "substantially free of sulphur" within the meaning of that language as used in the van Waes patent.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the parties and subject matter of this civil action, under 28 U.S.C. §§ 1388 and 1400(b), and 35 U.S.C. § 271, and Chapter 29, Sections 281–285.

2. United States Letters Patent No. 2,727,069, was duly and legally issued on May 13, 1955 to Joseph P. M. van Waes as inventor, and to the Plaintiff herein, Stamicarbon, N.V., as assignee and now owner of all right, title and interest in and to said Letters Patent.

3. The aforesaid patent in suit is entitled to the presumption of validity under 35 U.S.C. § 282, and the proof offered to overcome this presumption of validity must be such as to prove invalidity beyond a reasonable doubt.

4. The aforesaid patent in suit is entitled to the benefit of the Netherlands priority date of April 15, 1953, under

the provisions of 35 U.S.C. § 119 and the International Convention for the Protection of Industrial Property (53 Stat. 1748).

5. The "time the invention was made" as recited at 35 U.S.C. § 103 is, under the provisions of 35 U.S.C. §§ 104 and 119, the 15th day of April, 1953, in this case.

6. The aforesaid patent in suit duly and legally complies with all of the provisions of Title 35, U.S.C., Chapter 11, being properly filed in the name of the first and true inventor, and containing the requisite written description of the invention and the proper claims particularly pointing out and distinctly claiming the subject matter regarded by the inventor as his invention, and otherwise complying with all formal requirements of the patent law in the United States Patent Office.

7. The aforesaid patent in suit was duly and legally issued in compliance with all provisions of Title 35 United States Code Chapter 14, Sections 151–154, and the owners of the patent thereby obtained, under the patent law, "the right to exclude others from making, using, or selling the invention throughout the United States."

8. The invention of the patent in suit is for a "process", for the manufacture of urea, and as such is patentable subject matter under the provisions of 35 U.S.C. §§ 100 and 101.

9. Claims 1–3 of the aforesaid patent in suit define subject matter which was novel with respect to all of the "prior art", as the same is defined in 35 U.S.C. § 102.

10. The "prior art" which is referred to in 35 U.S.C. § 103, and against which the "differences between the subject matter sought to be patented" are to be tested as to whether or not the same were "obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains", is the "prior art" which is defined under the provisions of 35 U.S.C. § 102.

11. The evidence does not establish that the novel features of the subject matter defined by the claims of the patent in suit "would have been obvious at the time the invention was made to a person having ordinary skill in the art to which" this invention pertains.

12. Patents and printed publications are not prior art if the effective date thereof is subsequent to the date of invention to which a patent in suit is entitled.

13. The effective date of a domestic patent is its filing date, and the effective date of a foreign patent is its date of issuance, for purposes of establishing whether or not the same are "prior art" under 35 U.S.C. §§ 102 and 103.

14. Evidence to show that an invention was "known or used by others in this country" must include evidence showing that it was "publicly" known or used by others in this country; secret uses which are not publicly known or disclosed do not constitute "prior art" under the provisions of 35 U.S.C. §§ 102 and 103.

15. The distribution of internal and confidential memoranda or correspondence, relating to experimentation or trade secret and confidential information, does not constitute evidence of a publication, which would make such memoranda or correspondence "prior art" within the meaning of either 35 U.S.C. §§ 102 and 103.

16. An invention, or any part thereof, may be reduced to practice by actual successful testing thereof, or, alternatively, by filing a patent application disclosing features which have never been tested, which filing constitutes a constructive reduction to practice of such nontested features. The constructive reduction to practice of an invention, or parts thereof—the claimed range of .1 to 3% in this patent—is as effective under the law as actual reduction to practice of the same, to establish

**1216**

the inventor's right to the patent protecting such invention.

17. The .1 to 3% range of oxygen addition taught by the van Waes patent in suit does not affect the validity of the patent whether or not such range is of technological necessity. Such range only represents the sphere of the invention which the patentee has reserved to himself while abandoning the remainder to the public.

■ 18. Evidence of prior efforts, offered to be considered as prior art, available against the patent under 35 U.S.C. § 102, must meet the minimum standard of establishing that the prior efforts culminated in a completion of the invention, full reduction to practice and recognition of the nature of the same invention claimed in the patent in suit; no such evidence was here presented.

■ 19. Evidence showing that the concept and nature of the invention was not readily accepted by those most skilled and knowledgeable in the art to which it pertains and was not in fact believed by such persons to work, is evidence of the unobviousness of the invention.

■ 20. Evidence showing that when others who worked on the same problem devised similar or related techniques to solve that problem, they regarded their development as "important", "significant", a "highlight" and something to be kept "secret" as a commercially valuable development, is evidence of the unobviousness of the invention.

■ 21. Evidence of prior work by others resulting in solutions to the problem similar to that devised by the inventor, or of simultaneous work resulting in identical solution, but who kept such solutions secret and concealed from the public is to be received as evidence going only to obviousness or unobviousness of the patent in question, and may be, under particular circumstances, evidence of either.

■ 22. Evidence offered to show a simultaneous solution by persons in foreign countries of the problem which confronted the patentee of the patent in suit is admissible on the question whether such solution "would have been obvious at the time the invention was made to a person having ordinary skill in the art" as recited in 35 U.S.C. § 103, even though the inventor is not constructively charged with such foreign knowledge either under 35 U.S.C. § 102 or 103.

■ 23. Evidence of simultaneous work by others on solutions to the problem similar to that devised by the inventor of the patent in suit must be clear and convincing if offered as evidence of obviousness under 35 U.S.C. § 103.

■ 24. Evidence of simultaneous work by others on solutions to the problem similar to that devised by the inventor of the patent in suit may be indicative, but is not decisive, of unobviousness.

■ 25. Consideration of the standard of invention specified in 35 U.S.C. § 103, properly includes consideration of the length of time the art, though needing the invention, operated without it, evidence of others who sought to supply the need recognized in the art, but failed to do so by the means of the invention of the patent in suit, and the extent to which the invention of the patent in suit has been recognized in the industry, and replaced what had previously been available. The evidence bearing on these factors individually and collectively constitute evidence bearing on the question of obviousness of the invention, and, in the case of doubt as to such obviousness, such evidence may be relied upon as determinative in favor of the validity of the patent.

26. The invention described and claimed in claims 1 to 3 of United States Letters Patent No. 2,727,069 is new, useful, novel under the provisions of 35 U.S.C. § 102, and was not "obvious" within the meaning of 35 U.S.C. § 103.

27. A process is not "on sale" within the meaning of 35 U.S.C. § 102(b) when a party or parties, other than the inventor of the patent in suit covering the process or someone deriving title to the patent from him, seek to sell or offer to sell the process without divulging to the public essential features of the process as claimed in the patent in suit, and in fact while maintaining such essential features secret and confidential.

28. The "person having ordinary skill in the art" as recited at 35 U.S.C. § 103 is, in this case, an ordinary industrial chemist who has familiarity with the technology of urea production and, by virtue of his training or experience, general knowledge of the principles involved in corrosion control in various chemical processes, as of April 15, 1953.

29. The proof and evidence offered established that the patent in suit has been infringed by Defendant, and is insufficient to overcome the presumption of validity of the patent to which it is entitled under 35 U.S.C. § 282. The defenses of "obviousness", "on sale" and lack of invention presented by Defendant are not sustained by the evidence.

30. Claims 1, 2 and 3 of the Plaintiff's patent in suit United States Letters Patent No. 2,727,069 are valid and have been infringed by the Defendant.

31. Order determining Defendant to be liable to plaintiff for infringement of its valid patent and directing determination of remaining issues at a later time to be fixed by the court should and will be entered.

\* \* \*

The Findings of Fact and Conclusions of Law contained herein are adopted by this Court pursuant to Rule 52 of the Federal Rules of Civil Procedure. To the extent that Findings of Fact may also be considered Conclusions of Law or Conclusions of Law considered Findings of Fact, they are hereby adopted as such, notwithstanding sectional labeling to the contrary.