**POTTER INSTRUMENT COMPANY, INC.**

v.

**ODEC COMPUTER SYSTEMS, INC.**

**Civ. A. No. 4711.**

United States District Court,
D. Rhode Island.

Jan. 17, 1974.

---

Richard L. Aitken and Donald R. Dunner, Lane, Aitken, Dunner & Ziems, Washington, D. C., Deming E. Sherman, Edwards & Angell, Providence, R. I., for plaintiff.

Albert E. Fey and William J. Gilbreth, Fish & Neave, New York City, Thomas H. Quinn, Swan, Keeney, Jenckes & Asquith, Providence, R. I., for defendant.

## OPINION

PETTINE, Chief Judge.

This is a patent infringement action in which the plaintiff has charged the defendant with infringement of two patents (Patent No. 26,240 "High Speed Printers with Column Spanning Hammers"; Patent No. 3,402,657 "High Speed Belt Printer with Printing Slug Supporting Means") relating to the details of mechanical devices employed with printing machines, called "line printers" used to print the output information from computers and similar data processing equipment. The plaintiff seeks an injunction and accounting.

Jurisdiction is based on 35 U.S.C., 28 U.S.C. § 1338(a) and § 1400(b) respectively.

Potter Instrument Company, Inc. is a New York corporation having a principal place of business in Plainview, Long Island, New York and ODEC Computer Systems, Inc. is a Rhode Island corporation with its principal place of business in Warwick, Rhode Island.

Patent No. 26,240 entitled "High Speed Printers with Column Spanning Hammers," hereinafter referred to as the "Wasserman Patent," dated July 18, 1967, is a reissue of original patent 3,220,343 which issued November 30, 1965, on an application filed November 25, 1960. Patent No. 3,402,657 entitled "High Speed Belt Printer with Printing Slug Supporting Means," hereinafter referred to as the "Potter Patent" issued September 24, 1968, on an application filed November 25, 1965. Both of these patents are owned by the plaintiff.

The issues framed by the pleadings involve claims 7, 12, and 13 of the "Wasserman Patent" all of which, however, stand or fall on claim 13.[1] Claims 14

---

1. "13. In a high speed printer of the type in which characters are printed on a web of print receiving material in character spaces lying on a print line, the combination comprising: an endless flexible carrier, means for driving said carrier continuously in a path having a flight portion parallel to said print line, a plurality of type faces supported on said carrier for uninterrupted movement along said print

and 15 are at issue in the "Potter Patent" and stand or fall on claim 15.[2]

As to the "Wasserman Patent," the defendant argues invalidity by reason of obviousness (35 U.S.C. § 103)[3] and in confirmation thereof independent developments; prior invention (35 U.S.C. § 102(g))[4], improper reissue (35 U.S.C. § 251) [5] and non-infringement.

As to the "Potter Patent," the defendant argues the two conventional defenses of obviousness and non-infringement.

### "Wasserman Patent"

The "Wasserman Patent" describes two different high speed printers. One is known as a drum printer and the other as a chain printer. The drum printer has three columns of staggered type faces on a rotating drum as the type carrier. This drum rotates past a row of hammers arranged parallel to the axis of the drum. The chain printer employs an endless belt or chain to carry the type past a row of hammers

line and past said character spaces thereon, a plurality of hammers having heads located on said print line, each of said hammers spanning at least two of said character spaces, means to provide a signal designating the instant a selected type face registers with a selected character space, and means to actuate one of said hammers in response to said signal whereby the web receives a printed image of a character on said selected type face at the location of said character space."

2. "15. In a high speed printer, a print chain comprising: a timing belt of the type formed from dimensionally stable elastomeric material and having accurately spaced teeth on the inner surface thereof; a plurality of printing slugs on the outer surface of said belt, said printing slugs having rearwardly projecting portions cooperating with said teeth to retain said slugs in accurately spaced relation to each other; and belt driving means including teeth to mesh directly with the teeth on said belt."

3. "§ 103. Conditions for patentability; nonobvious subject matter
A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made. July 19, 1952, c. 950, § 1, 66 Stat. 798."

4. "§ 102. Conditions for patentability; novelty and loss of right to patent
(g) before the applicant's invention thereof the invention was made in this country by another who had not aban-

doned, suppressed, or concealed it. In determining priority of invention there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other. July 19, 1952, c. 950, § 1, 66 Stat. 797."

5. "§ 251. Reissue of defective patents
Whenever any patent is, through error without any deceptive intention, deemed wholly or partly inoperative or invalid, by reason of a defective specification or drawing, or by reason of the patentee claiming more or less than he had a right to claim in the patent, the Commissioner shall, on the surrender of such patent and the payment of the fee required by law, reissue the patent for the invention disclosed in the original patent, and in accordance with a new and amended application, for the unexpired part of the term of the original patent. No new matter shall be introduced into the application for reissue.
The Commissioner may issue several reissued patents for distinct and separate parts of the thing patented, upon demand of the applicant, and upon payment of the required fee for a reissue for each of such reissued patents.
The provisions of this title relating to applications for patent shall be applicable to applications for reissue of a patent, except that application for reissue may be made and sworn to by the assignee of the entire interest if the application does not seek to enlarge the scope of the claims of the original patent.
No reissued patent shall be granted enlarging the scope of the claims of the original patent unless applied for within two years from the grant of the original patent. July 19, 1952, c. 950, § 1, 66 Stat. 808."

parallel to the print line. In both it is these hammers which carry out the printing as they are selectively activated to strike the type on the moving type carrier. Specifically, the heart of the issue is that these hammers span more than one column with a face wide enough to span and operate in conjunction with more than one character space or "column" on the print line. The type faces are arranged on the drum or belt so that in printing a character in one column, it will encounter voids in the other column and as a consequence not print in the other column it spans. This permits selective printing in all the columns it spans, thus dividing the number of hammers required by the number of columns it spans. These hammers work exactly the same whether it be a drum type or a belt carrier since all that is needed is a type array which provides a void in one column when the hammer is printing in another and a logic circuitry to selectively activate the hammers.

Though the patent describes a logic or closed circuitry, it is clear from the testimony of the experts that such circuitry is not important here and need not be considered. It can be said, and the court so finds, that the experts for both litigants agree to this fact. All printers require such control and logic circuitry which were, as stated by Dr. Beam, "well in the capabilities of a person skilled in the art before the filing of the applications for the patents in suit." To further quote witness testimony, Dr. Beam, the plaintiff's expert, stated that logic circuitry was a matter which "need not concern us, that is, it is required by the claim but its details need not concern us." The inventive concept, therefore, is as he stated and I so find, nothing more than ". . . the combination in the high-speed on-the-fly printer of specially arranged type with column spanning hammers" with a well understood conventional logic circuitry.

## Obviousness

The Court will first consider the defense of anticipation or obviousness.

It seems to me that a review of the prior art to the "Wasserman Patent" leads to the conclusion that the concept and utilization of column spanning hammers dates back to the 18th century as is significantly shown in the C. J. Wiley, Printing Telegraph, patented November 22, 1887. Dr. Beam, the plaintiff's expert, testified that the Wiley printer used staggered type array that ". . . enabled that 1–3 column wide hammer to print the three columns . . ." and that " . . . conceptually that is the same way that Mr. Wasserman used a column-spanning hammer with a type array in three columns . . ." The plaintiff's argument that the Wiley patent being an 18th century indexing serial printer, was not in the art which would be looked to by a person with ordinary skill working in the high speed printer art in 1960 is not persuasive. To buttress this conclusion, the plaintiff points to the testimony of defendant's witness, Dr. Eng. I do not find such testimony supporting the plaintiff's position. Dr. Eng specifically stated he looked to literature of "the vintage of the 1880's." The other experts said the same thing. In substance, their testimony was that all relevant art on printing mechanisms is researched even to "designs in the ash heap to see if they could be put to good use."

Even as to on-the-fly printers before Wasserman, the wide hammer was used with different type arrays. As the defendant points out, "The Hoffman patent (part of the prior art cited by defendant) shows an on-the-fly printer having hammers two characters wide and spanning two 'columns' transitionally with helically arrayed type faces. Adjacent each helix having type characters in it is a helix deliberately left vacant so that the wide hammers will not double print."

Indeed, in addition to Wiley and Hoffman, the prior art of Hilton and Miles offered by the defense show the use of column spanning members and in applying to such hammers the undisputed fact that logic or closed circuitry to selective-

ly activate the hammers is not important since all printers require it and that it is routine and further that staggering or arranging type was no new trick, I must conclude the Wasserman invention lacks patentability. The way Wasserman reads on the prior art of Wiley and the contemporaneous independent developments, as will be discussed *infra*, further strengthens the Court's position.

The plaintiff cannot escape the simple fact that the only inventive concept at issue is that of column spanning hammers with a face wide enough to span and operate in conjunction with more than one character space or characters on the print line and that column spanning hammers are old in the art and that logic circuitry to selectively activate the hammers is of no consequence.

Wiley certainly shows cooperating hammers with type faces on type wheels printing impressions on paper being advanced through the machine. These are column spanning hammers as in Wasserman and the type faces are staggered so that in printing a character in one column there will be voids beneath the hammer in the other two columns.

Now while it is true that the Wiley patent as well as Miles and Hilton do not relate to chain printers and that the hammers in Wiley may operate somewhat differently, the fact remains it falls within the same general art, that is to say, column spanning hammers with a type array in multiple columns. This known device was merely put to a new use employing a well known and established circuitry system that need not concern us. American Tube and Controls, Inc. v. General Fittings Company, 407 F.2d 1291 (1st Cir. 1969).

What we have here is the end result of mechanical aptitude, combining old elements rather than an "inventive mind." A strict standard of obviousness must be applied. Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 152, 71 S.Ct. 127, 95 L.Ed. 162 (1950).

I find impressive Dr. Eng's testimony who stated that in December of 1959, while associated with Honeywell Company, he conceived the idea of eliminating half the hammers in a high speed printer without knowledge of Wasserman's doing. The plaintiff tried to discredit this testimony by showing the witness had expertise beyond that of one with ordinary skill in the art. However, he fails to recognize that the testimony shows that David F. Sweeney, as chief engineer of ANelex Corporation, with limited exposure to line printers conceived the idea of column spanning hammers with appropriate type array in high speed on the fly printers; together with one John Sims, his project engineer, they completed the design and construction of a high speed printer with column spanning hammers late in 1960. Likewise, Bjarne Jacobsen of UNivac Corporation had the same idea in 1969 though he had no experience in the design or operation of line printers. Mr. Jacobsen conceived using column spanning hammers with a helical type font as in the Hoffman patent. When he had this idea he was not aware of the Hoffman patent. It finally resulted in the filing of a patent application which became involved in an interference suit and finally abandoned.

The defense hardly opposes this record but rather argues that such contemporaneous work resulting in the same invention is evidence of unobviousness in that these inventors, by filing applications for patents on their development, (two of these applications were involved in an interference proceeding in the Patent Office with patent No. 26,240) regarded their inventions as important and unobvious citing Stamicarbon, N.V. v. Escambia Chemical Corp., 300 F.Supp. 1209, 1216 (N.D.Fla.1969), modified, 430 F.2d 920 (5th Cir. 1970), cert. denied, 400 U.S. 944, 91 S.Ct. 345, 27 L.Ed.2d 248 (1970). The reliance on this authority is misplaced. The District Court found no persuasive evidence of contemporaneous independent development as I do in this case.

■ Referring to the factual findings of this Court, it is established that other inventors (Eng, Sweeney, Sims, Jacobsen) in the field independently arrived at the same goal with the same idea simultaneously with Wasserman. This is evidence confirming obviousness. Photon, Inc. v. Harris-Intertype Corp., 235 F.Supp. 921 (D.Mass.1964), aff'd per curiam, 349 F.2d 856 (1st Cir. 1965); Canadian Ingersoll-Rand Co., Ltd. v. Peterson Products of San Mateo, Inc., 223 F.Supp. 803 (N.D.Cal.1963), aff'd, 350 F.2d 18 (9th Cir. 1965).

> "The adaptation independently made by engineers and builders of these familiar appliances to the movement and distribution of concrete cement in building operations and the independent patent applications, within a comparatively short space of time, for devices for that purpose are in themselves persuasive evidence that this use, in combination of well known mechanical elements was the product only of ordinary mechanical or engineering skill and not of inventive genius. Atlantic Works v. Brady, 107 U. S. 192, 2 S.Ct. 225, 27 L.Ed. 438. It is but 'the suggestion of that common experience, which arose spontaneously and by a necessity of human reasoning, in the minds of those who had become acquainted with the circumstances with which they had to deal.' Hollister v. Benedict Manufacturing Co., 113 U.S. 59, 72, 5 S.Ct. 717, 724 (28 L.Ed. 901)." Concrete Appliances Co. v. Gomery, 269 U.S. 177, 185, 46 S.Ct. 42, 45, 70 L.Ed. 222 (1925).

Patent monopoly is the exception to the economic rule that competitiveness in the sale of a product best serves the public interest. On the other hand, the countervailing public interest of encouraging disclosures of new developments is ample justification, conditioned as it is on being granted only to those who make "substantial" discovery.

> "The design of the patent laws is to reward those who make some substantial discovery or invention, which adds to our knowledge and makes a step in advance in the useful arts. Such inventors are worthy of all favor. It was never the object of those laws to grant a monopoly for every trifling device, every shadow of a shade of an idea, which would naturally and spontaneously occur to any skilled mechanic or operator in the ordinary progress of manufactures. Such an indiscriminate creation of exclusive privileges tends rather to obstruct than to stimulate invention." Atlantic Works v. Brady (1883), 107 U.S. 192, 200, 2 S.Ct. 225, 231, 27 L.Ed. 438.

This statement, though uttered over 90 years ago, has lost none of its viability in the enactment of § 103 of 35 U.S.C. The requirements for a patent to constitute a forward step of patentable stature is found in this section.

> "A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains . . . ."

■ Objective standards to judge patentability are illusive and, "What is obvious is not a question upon which there is likely to be uniformity of thought in every given factual context . . . ." Graham v. John Deere Co., 383 U.S. 1, 18, 86 S.Ct. 684, 694, 15 L. Ed.2d 545 (1966):

> "While the ultimate question of patent validity is one of law (citation omitted) . . . the § 103 condition, which is but one of three conditions, each of which must be satisfied, lends itself to several basic factual inquiries. Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill

in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined." 383 U.S. at 17, 86 S. Ct. at 694.

So I answer in the affirmative the question whether in considering the subject matter as a whole the "Wasserman Patent" would have been obvious to a person having ordinary skill in the art to use the column spanning hammer concept of Wiley in an on-the-fly printer.

■ The defendant has met the required quantum of proof. In so concluding, I start with the presumption that once a patent is issued by the Patent Office, it is valid and the burden of establishing invalidity is on the defendant.

■ Though it may be said that the authorities are in a "morass of conflict" and that there are numerous cases dealing with ". . . the quantum of proof required to overcome the presumption of validity . . ." Stamicarbon, N.V. v. Escambia Chemical Corporation, 430 F.2d 920, 924 (5th Cir. 1970), the First Circuit Court has spoken to the issue and teaches that, "The presumption of validity may not be a very strong presumption, but it places some burden other than forensic upon an infringer." Wilson Research Corp. v. Piolite Plastics Corp., 327 F.2d 139, 140 (1963). The fact that this Court may have before it the same references which were considered by the Patent Office does not, in determining this issue of proof, relieve it of its responsibility as a fact finder to determine the question of obviousness on the basis of the prior art. This is my prerogative and as Judge Aldrich stated in Parkway Furniture Mfg. Co. v. Dav-o-Niter Corp., 132 F.Supp. 37, 38 (D. Mass.1955), "In all fairness I do not attach much weight to that presumption [of validity]."

This Court in Sherman v. Moore Fabrics, Inc., 179 F.Supp. 74, 80 (1959) stated:

"While it is true that a presumption of validity attaches to every patent, 35 U.S.C.A. § 282, it is well settled that 'the presumption of validity is hardly more than a procedural device to establish a prima facie case that cannot survive in the face of undisputed facts showing there is no invention'."

See Hughes Aircraft Co. v. General Instrument Corp., 275 F.Supp. 961, 972–973 (D.R.I.1967) employing reasonable doubt standard. I need not reconcile these differences.

In this case, I find the defendant's position so established as to leave no reasonable doubt in my mind as I view the prior art. In the course of this trial, the Court repeatedly stated it was troubled with the evidence and even went so far as to suggest the appointment of an expert. This concern stemmed from its reaction to the developing evidence as unmistakably proving defense of obviousness. A study and reading of the patents within my capacity has confirmed this conclusion.

■ I do not dispute the fact that at times a small difference can give an invention the dimension of patentability. However, the mere consideration of differences is not the applicable touchstone. We must still look to the subject matter as a whole, United States v. Adams, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966), and the routine transfer of concepts and techniques from one art to related arts, American Tube and Controls, Inc. v. General Fittings Co., supra.

Minds may differ as to the facts in this case but I conclude that the prior art clearly taught the use of column spanning hammers with a type array that would enable the hammer to strike only one character at a time in the column it spans and that anyone skilled in the art could arrive at the inventions in question by employing an established circuitry system. I find this concept established and recognized from the time of Wiley and given this concept with all the intervening known developments to selectively activate hammers, I fail to see patentability. The differences are of no consequence. Furthermore, in considering the skill of the calling, there

is nothing in this record showing that the personnel in this field needed to be of an extremely high order of technical skill and judgment. On the contrary, as stated *supra,* the facts show simultaneous development by Sweeney who had little exposure in this area.

I find the subject matter of the Wasserman Reissue Patent would have been obvious to a person skilled in the art at the time the subject matter was devised and is, therefore, invalid under 35 U.S.C. § 103.

Though this is dispositive of this patent, the Court is mindful of appellate review and that judicial economy will be served by disposing of two other issues, namely:

1) Was Sweeney prior to Wasserman under 35 U.S.C. § 102? and

2) Was Wasserman improperly issued?

*Invalidity of Wasserman Patent under 35 U.S.C. § 102(g) (Prior Invention)*

Section 102(g) of the 1952 Patent Act states in pertinent part:

"A person shall be entitled to a patent unless

(g) before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it. In determining priority of invention there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was *first to conceive and last to reduce to practice, from a time prior to conception by the other."* (emphasis added)

 Under this section, a court may hold a patent invalid by reason of prior invention by another reduced to practice and not abandoned, suppressed or concealed. This section means that the party who first reduces his invention to practice, either constructively or actually, shall be awarded priority of invention and be entitled to the patent unless a second party first conceived the invention and before it was conceived by another was diligent in reducing his invention to practice up until the reduction to practice by the second party. In such case, he shall be entitled to the invention even though he was last to reduce it to practice. I. C. Rivise & A. Caeser, Interference Law and Practice, sec. 173 (1949).

 The burden of "Proof of an alleged inventor's conception and reduction to practice . . ." is a heavy one and " . . . requires full corroboration by other than the inventor's own self-serving testimony or records. (citations omitted)" Eastman Kodak Co. v. E. I. DuPont de Nemours & Co., 298 F. Supp. 718, 728 (E.D.Tenn.N.D.1969), Hap Corporation v. Heyman Manufacturing Company, 311 F.2d 839 (1st Cir. 1962). Furthermore the reduction to practice requires that the invention be tested in a manner which will demonstrate it will function for the purpose intended.

"On the other hand, reduction to practice is not 'an inexorable condition in all circumstances' but merely one factor to be considered in determining whether the invention 'enriched the art.' Sinko Tool & Mfg. Co. v. Automatic Devices Corp., 157 F.2d 974, 977 (2d Cir. 1946). Judge Learned Hand in Sinko stated the doctrine succinctly:

'[A] test under service conditions is necessary in those cases, and in those only, in which persons qualified in the art would require such a test before they were willing to manufacture and sell the invention, as it stands.'

Furthermore, changes made to eliminate crudities do not postpone the date of reduction to practice. This articulation of the doctrine has been adopted in later cases, American Mach. & Foundry Co. v. Liggett & Myers Tobacco Co., 172 F.Supp. 12 (D.N.J.1959); General Elec. Co. v.

Philco Corp., 99 F.Supp. 707 (S.D.N.Y.1951), and amplified in others:

'With some products, it is clear that actual use may be necessary to show reduction to practice * * * With others, however, laboratory (or similar) tests may be sufficient * * * The governing considerations are two: First, do the tests employed—in actual use or in the laboratory—show that the product will serve the purpose for which it is designed, and show this so conclusively that practical men will without more take the risk of putting it into immediate commercial production and use? Second, would the time, effort and expense of conducting actual field experiments be unjustified because of the small likelihood that they would yield substantially greater knowledge concerning the product's performance?' Larsen v. Marzall, 90 U.S.App.D.C. 260, 195 F.2d 200, 202 (1952).

\* \* \* \* \* \*

'We think it is clear that reduction to practice does not mean that whatever is being worked upon has to be in shape to be commercially marketable. On the other hand, it must be a demonstration that the invention's idea works, not that he has thought the matter out and devised something that ought to work and may work but actually something that will work to accomplish its intended purpose.' Radio Corp. of America v. International Standard Elec. Corp., 232 F.2d 726, 730 (3d Cir. 1956).

\* \* \* \* \* \*

'[W]e do not believe that an actual reduction to practice necessarily requires the making of a commercially acceptable embodiment, * * * if the testing of it shows that it will perform its intended function. The amount of testing necessary depends upon the facts of the particular case. * * * [W]e believe the law to be that reduction to practice is proved when there is corroborated testimony that the device actually performed the function for which it was designed.' Schnick v. Fenn, 277 F.2d 935, 939–940 (C.C.P.A.1960)." Farrand Optical Co. v. United States, 325 F.2d 328, 332, 333 (2d Cir. 1963).

See also Walker on Patents, sec. 46, p. 205; Corona Cord Tire Co. v. Dovan Chemical Corp., 276 U.S. 358, 383, 48 S.Ct. 380, 72 L.Ed. 610 (1928); Amerline Corporation v. Cosmo Plastics Company, 407 F.2d 666, 670 (7th Cir. 1969); Sutter Products Co. v. Pettibone Mulliken Corp., 428 F.2d 639, 647 (7th Cir. 1970).

Turning to the facts, I find that Mr. David Sweeney, as director of engineering for ANelex Corporation, engaged in the production of high speed line printers and conceived of the idea of column spanning hammers as a cost reduction objective in preparing quotations for listing printers; (a calculator type of printer—i. e. with an output like a cash register tape) in that one hammer would serve two purposes, i. e. if it spanned two columns, it would be half as expensive—if three columns, one-third as expensive. A month following this idea, he wrote it out "sometime in *January of 1960*" as a report to the vice president of engineering at ANelex to be used by him on a sales trip for the purpose of acquiring new customers. This document was identified by the witness and introduced as an exhibit. In the late spring or winter of 1960, he prepared "hardware"—i. e. a modified ANelex hammer and print drum and "achieved multiple duty printing." This Court interprets "hardware" to mean a model. This model was not introduced as evidence nor was its construction corroborated by any other person. The testimony lacks chronological preciseness and as a consequence clarity of proof. However, considering the record as a whole, I find that as the result of a crash program at ANelex to produce a printer for the National Cash Register Company ("NCR"), an engineering model was made and approved by "NCR" on November 19, 1960, a pre-production prototype demonstrated on December 24, 1960

and formally accepted by "NCR" on January 12, 1961.

Plaintiff's testimony is that Mr. Wasserman told Mr. Pandolfi, Manager of military products for the plaintiff company, of his concept of the column spanning hammer in a drum printer in March of 1960 and that prior to May, i. e. in late March, a model was completed (The witness fixed the date in relation to the purchase of a car) and satisfactorily tested. In July of 1960, a written disclosure was delivered by Mr. Wasserman to his attorney which resulted in the filing of a patent application on November 25, 1960.

■ From these facts, I find Sweeney conceived the column spanning hammer in December 1959 as against Wasserman's conception in March of 1960. However, I find Wasserman was first to build a working model, having done so in March of 1960 as against Sweeney who testified he built the "hardware" in "late winter-spring of 1960." If winter ends March 20, I conclude the model was completed thereafter. However, I further conclude Sweeney was diligent in reducing his model to practice as is evident from the crash program at ANelex and its culmination in the engineering model in 1960 and the pre-production prototype in December of 1960. Therefore, I find he is entitled to his invention. The proof is corroborated through the verification of his conception by his January written report and the engineering model and pre-production prototype.

The plaintiff proffers two other arguments, namely, the Sweeney invention was a drum printer and not a chain printer and therefore is not the same as Wasserman's claim 13; and that the Sweeney engineering model in November 1960 failed because it could not show the printer would operate when connected to a computer which was the only purpose for which it was designed. I reject both these contentions.

The Court has made no effort to draw a distinction between drum and chain printers because it finds the evidence overwhelming as to the equivalence of drum and chain printers. The experts Sims and Eng and the disclosure document by Wasserman himself do not support the plaintiff. With respect to column spanning hammers, it is clear drum and chain printers are no more than different embodiments of the same invention. It is merely a question of passing the characters in front of the face of the hammer. Suffice it to say Dr. Eng was abundantly clear on this point.

"Q Can you recall whether or not in 1959, you considered that your column-spanning hammer concept was limited to only drum-type printers, or whether it had application to other types of printers?

A The general concept does not limit to just a drum printer. It would be used in chain printers; it could be used in bar printers; you could use it in bar setting printers, so, you know, it's similar type of printing—you're using impact printing."

There is no cross examination of these witnesses or evidence to the contrary.

The plaintiff's contention that the engineering model failed is not factually sound as to the column spanning hammers which worked perfectly from the start and performed the function for which it was designed. Farrand Optical Co. v. United States, *supra.*

I find Sweeney to be a prior inventor under 35 U.S.C. § 102(g) and the "Wasserman Patent" is also invalid for this reason.

### Re-issue

*The patent was improperly reissued under 35 U.S.C. § 251*

■ The Patent Office history of Wasserman clearly shows that a series

of attempts by the plaintiff to have its proposed claims approved by the examiner without the recitation of staggered and off-set type arrangements were futile. On September 29, 1961, all claims of the original patent were rejected because " . . . claims fail to specifically define an arrangement which will necessarily produce the results as disclosed in the applicant's specification." (file wrapper p. 17–18). The full meaning of this is found in the examiner's rejection of the plaintiff's response that the inventive feature was the column spanning hammer and any pattern of type faces. The examiner was unmistakably clear in saying that if the plaintiff's position was accurate, it would not require "invention." He further stated, "It is thought the invention, if any, lies not merely in the column spanning hammer as stated in the remarks submitted with the amendment (shown by the references) but it lies in the unique co-operation *of the staggered* array of type with the dual column spanning hammer . . . " (emphasis added—file wrapper 22–23); and at page 46, rejecting an amendment filed April 19, 1965, he said, "In said office action numerous defects were pointed out with regard to the claims which rendered them subject to rejection as incomplete and indefinite and/or inaccurate. Thus the array of type faces *in staggered and offset columns and rows on a constantly rotary type drum movable past a print line was indicated as necessary to define properly* and completely the alleged invention, together with a statement of the individual hammers having heads spanning plural columns." The omission of these claims resulted in the rejection.

Without tracing each vain attempt by the plaintiff, the file wrapper clearly shows that it was only when the staggered and offset type array was recited in all claims was the examiner satisfied and allowed the claims.

 The elimination of this coverage in the reissued claims in essence restored the breadth of the original rejected claims, thus relieving Wasserman of the commitment made to secure the original patent and allowing him to recapture what had been denied. This is an improper "use of section 251 of Title 35, since one is bound by actions taken to secure a patent and may not thereafter claim 'error'." St. Regis Paper Company v. Tee-Pac, Inc., 352 F.Supp. 309, 317 (N.D.Ohio E.D.1973). Shepard v. Carrigan, 116 U.S. 593, 597, 6 S.Ct. 493, 29 L.Ed. 723 (1886); Leggett v. Avery, 101 U.S. 256, 259–260, 25 L.Ed. 865 (1897); Altoona Theaters v. Tri-Ergon Corp., 294 U.S. 477, 492, 55 S.Ct. 455, 79 L.Ed. 1005 (1935); Haliczer v. United States, 356 F.2d 541, 545, 174 Ct.Cl. 507 (1966). This was not the mere omission of a reference but rather the severance and removal of the patentable jugular itself without which there is no life to the claim. The plaintiff argues that, "The fact that claim 7 throughout the prosecution history always included a recitation of the flexible type carrier demonstrates the fact that plaintiff never intended to give up coverage on the chain printer." (plaintiff's post-trial brief, p. 9). I do not agree. I find a reading of the file wrapper as a whole evidences an examiner's insistence the limitations be inserted and that without them no claims would be allowed. To me this is inescapable. The teaching of St. Regis Paper Company v. Tee-Pac, Inc., *supra,* is directly in point. The McCullough Tool Company v. Well Surveys, Inc., 343 F.2d 381 (10th Cir. 1965) case is not, as argued by the plaintiff, "similar" to the situation in the present case. There it was a question of the weight of the evidence which supported the finding that the subject matter of the claim in the reissued patent was explicitly disclosed and taught but not claimed in the original patent and that the inventions of the reissued claims and the original were the same. We cannot so conclude in this case unless it can be said that "specially

arranged," "substantially equally spaced type faces," "row of spaced type faces," "plurality of rows of type faces" and "character spaces lying on a print line" are synonymous with "staggered array of type." I cannot so conclude. They simply do not mean the same—they do not lend patentability. Obviously this motivated the examiner. That is why he refused to allow the original claims with this language.

I find the "Wasserman Patent" 26,240 is invalid because improperly reissued.

*Potter Patent*

We need concern ourselves only with claim 15, *supra*, which discloses and claims in a high speed printer, ". . . a print chain comprising a *timing belt . . . having accurately spaced teeth on the inner surface thereof . . . printing slugs on the outer surface of said belt . . . having rearwardly projecting portions co-operating with said teeth . . .*". (emphasis added)

This is best understood by viewing the following illustration:

rearwardly extending portions co-operating with teeth of timing belt

inwardly projecting walls

accurately spaced teeth

smooth outer surface of a timing belt

rearwardly extending portions co-operating with teeth of timing belt

*226*

---

Until 1965 the only chain printer on the market was sold by "IBM" for approximately $40,000. It utilized a print chain with screwed slugs clamped to the belt. This method of placing the print slugs on the belt required very close tol-erances and consequently gave rise to difficulties in accurately positioning the type slugs (Simpson, *infra*, also used screwed slugs). Here again a picture best presents what the Court has attempted to describe:

*Simpson Patent*

The problems of mounting slugs made the chain or belt quite expensive. This cost was drastically reduced by the one piece Potter construction because it was simpler and therefore cheaper to manufacture.

While the plaintiff was prosecuting his application in the Patent Office, it was recognized that a prior patent, Simpson, 3,113,509 "Type Belt Device," December 10, 1963, used teeth on a belt to retain alignment of the slugs.[6] The plaintiff admitted that the detents on the Simpson belt "obviously" cured the

". . . serious problems in achieving initial spacing of the printed slugs on the belt, as well as in retaining the spacing of those print slugs on the belt once they are positioned." (Potter file wrapper, letter dated October 18, 1967)

Potter nevertheless urged his entitlement to the patent on the ground that he differed from Simpson in the use of a one piece printing slug construction on the other surface of the belt provided

with rearwardly projecting portions. I find this was the only basis for the issuance of the patent.

The first question which comes to the court's mind is whether or not a one piece slug with the features recited by Potter was obvious. I believe and find that the answer is clearly "yes".

The Potter slug offered nothing new. This conclusion by the court requires consideration of a 1958 IBM Technical Bulletin which was not considered by the Patent Office as part of the prior art. In viewing this prior art, the obviousness of the type slug, the conventionality of the timing belt, and the apparent manner of attaching the slug to the belt can readily be seen.

The plaintiff objects to this Bulletin contending it cannot be considered as prior art because it is not a "printed publication" within the meaning of 35 U.S.C. §§ 102, 103. It argues that the Bulletin is available to the computer industry only through a few li-

---

6. The Simpson Patent is a belt printer using a belt which is provided with detents (teeth) on its outer surface. The type members carried by the belt have grooves on their corresponding surface so that when a type member is attached to the belt, it is accurately located and spaced from the other type members by the cooperation of the detents on the belt and the grooves in the type members.

braries and is not readily accessible to persons with ordinary skill working in the computer line printer art. I do not agree with the plaintiff's position.

■ Starting with John Crossley & Sons, Ltd. v. Hogg, 83 F. 488, 490 (1st Cir. 1897), it has been established that anything printed and accessible to the public is a "printed publication" within the meaning of § 102(b) even though it may be a single typed copy of a college thesis ". . . typewritten and lodged in the Library of a college. . . ." Indiana General Corp. v. Lockheed Aircraft Corp., 249 F.Supp. 809, 816 (S.D.Calif.1966) citing Hamilton Laboratories v. Massengill, 111 F.2d 584 (6th Cir. 1940) cert. denied, 311 U. S. 688, 61 S.Ct. 65, 85 L.Ed. 444.

> "Anything that is printed and made accessible to any part of the public is a printed publication. 1 Deller's Walker on Patents § 60 at 273 (2 ed.).

Confidential documents are not publications. *Id.* The key is disclosure by way of a medium capable of providing wide public access, in re Tenney (1958), 254 F.2d 619, 626, 45 CCPA 894, not commercial exploitation." Pickering v. Holman, 459 F.2d 403, 407 (9th Cir. 1972).

In this case the "IBM" Bulletin was received by the Scientific Library of the United States Patent Office on December 15, 1958, New York Public Library as early as June 4, 1959 and Brown University Library, May 11, 1964.

■ This publication must be considered. This disclosure shows attachments mounted on a timing belt for carrying paper feed pins attached in identically the same fashion as the structure used to attach printing slugs to a timing belt in the Potter patent in suit. This is seen by viewing the following illustration.

TIMING BELT

CAVITY TO FIT BELT AND BELT TOOTH

ATTACHMENT

PAPER FEED PIN

Dr. Beam, the plaintiff's expert, admitted that in the method of attachment it is identically the same "as the manner in which the printing slugs of the Potter Patent in suit are attached to its timing belt." There is no doubt in my mind

that the attachment is identical. Even conceding arguendo the remaining arguments of the plaintiff that a) the paper tractor of a computer printer is unrelated in function to the print chain of the printer; b) that accuracy and stress requirements of a paper tractor are totally different from those in a print chain, it does not foreclose the obviousness issue. We are not now speaking of infringement but rather of 35 U.S.C. § 103 and the application of the obviousness test set forth in *Graham, supra.*

To begin with we have an identical slug in the manner of its attachment to a belt; a level of ordinary skill in the pertinent art that enabled men to conceive of similar inventions (see discussion *supra* re Sweeney, Sims, Jacobsen) who had little or no exposure to this field.

Certain testimony highlighted by the defendant is persuasive. Roswell W. Gilbert said it would have been obvious to mount printing slugs on a timing belt; John Sims termed it an "ordinary engineering expedient."

The application of the amorphous guidelines of obviousness must finally rest with the Court albeit its lack of specialized training. This is a fact of life that may some day be changed. However, my view and understanding of this art constrains me to completely agree with the defendant.

The paper tractor of the "IBM" Bulletin is impressive and its interchangeability with character slug mounting structures is obvious. A reading of Perry's testimony (Vice President of ODEC and designer of ODEC's high-speed line printers) demonstrates the Court's position. He was working on the problem of placing slugs on the outer surface of the belt when he saw a paper tractor that used a timing belt to drive the pins which moved the paper and it became obvious to him that, "this is the way to attach something to a timing belt."

I find this testimony very convincing. It bolsters if not seals the obviousness question of using paper tractor structures to mount printing slugs.

As Sims explained, a timing belt is nothing more than a "flexible belt with teeth on it to engage two shafts to keep them so that they turn accurately with each other." As of 1959 timing belts were "well known" in the line printer art and further it was an "ordinary engineering expedient" to "clip type slugs" on to a timing belt "for use in a line printer." I quite agree. Furthermore, in addition to Simpson and the IBM Bulletin, I find compelling that other patents in the prior art used flexible belts with uniformly spaced teeth on the inner surface—*Paige* with an array of type characters and *Wooding.* Both of these patents are in evidence.

*"Courts should scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements.* The function of a patent is to add to the sum of useful knowledge. Patents cannot be sustained when, on the contrary, their effect is to subtract from former resources freely available to skilled artisans. A patent for a combination which only unites old elements with no change in their respective functions, such as is presented here, obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men. This patentee has added nothing to the total stock of knowledge, but has merely brought together segments of prior art and claims them in congregation as a monopoly." Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 152, 71 S.Ct. 127, 130, 95 L.Ed. 162 (1950), rehearing denied, 340 U.S. 918, 71 S.Ct. 349, 95 L.Ed. 663 (1951) (emphasis added).

I conclude that structures of both the Wasserman and Potter patents are disclosed in the prior art and fall short of a ". . . substantial innovation . . . for which society is truly indebted to the efforts of the patentee",

Sinclair & Carroll Co. v. Interchemical Corp., 325 U.S. 327, 330, 65 S.Ct. 1143, 1145, 89 L.Ed. 1644 (1945) and are invalid.

This finding being dispositive of the validity of the patents, I do not reach the question of infringement. However, the doctrine of equivalents being so critical to Potter it should be discussed.

Noting the limitations discussed *supra*, the defendant argues that the plaintiff can not resort to the doctrine of equivalents to broaden the claim and still distinguish it from the prior art; to put it differently, define a structure not obvious from the prior art.

■■■ In Shields-Jetco v. Torti, 314 F.Supp. 1292, 1299 (D.R.I.1970), aff'd, 436 F.2d 1061 (1st Cir. 1971), this Court stated:

"The threshold question is whether file wrapper estoppel exists here, limiting the range of equivalents upon which the patentee would otherwise rely in an infringement suit. The substance of file wrapper estoppel is that where a patentee has narrowed his patent claim in response to a rejection of the Patent Office, in order to obtain issuance of a patent, he is estopped from resorting to equivalents with respect to those limitations which were so introduced." (citations omitted)

See also Smith v. Magic City Club, 282 U.S. 784, 789–790, 51 S.Ct. 291, 75 L.Ed. 707 (1931); I. T. S. Co. v. Essex Co., 272 U.S. 429, 444, 47 S.Ct. 136, 71 L.Ed. 335 (1926); Exhibit Supply Co. v. Ace Patents Corp., 315 U.S. 126, 136–137, 62 S.Ct. 513, 86 L.Ed. 736 (1942).

■■■ Referring to the plaintiff's concession before the Patent Office and my finding, *supra*, that the only basis for the issuance of the patent was the plaintiff's one piece printing slug, we simply cannot escape the plaintiff's admission before the Patent Office concerning the effects of the detents on the Simpson belt. As a consequence, we must acknowledge the limitation in the Potter Patent

"calling for the accurately spaced integral teeth to be located on the inner surface of the belt in combination with the provision of rearwardly projecting portions on the slugs to engage these teeth on the belt inner surface."

I conclude that Potter did nothing more than take an obvious one piece type slug as a type member and combine it with a conventional type carrier belt with teeth on the inner surface. Such features simply do not lend patentability to this invention. However, as I have stated "obviousness" is an amorphous creature, and it may be that other minds might find the Potter one piece slug is not obvious. If so, the claim in question might be valid. I simply don't see it this way.

Costs and attorney's fees are reserved pending appellate review.

The defendant will draft an order reflecting the Court's rulings as set forth in this opinion.